631 F.2d 794
 203 U.S.App.D.C. 212
 EAST TENNESSEE NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Tennessee Natural Gas Lines, Inc., East Tennessee Group,
Tennessee Public Service Commission, Intervenors.
TENNESSEE NATURAL GAS LINES, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Tennessee Public Service Commission, Intervenor.
 Nos. 79-1413, 79-1442.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 1, 1980.
Decided May 14, 1980.
 
 Petitions for Review of an Order of the Federal Energy Regulatory commission.
 Dale A. Wright, Michael J. McDanold, James R. Schroll, Terence J. Collins, Washington, D. C. and John A. Ferguson were on brief, for petitioner in No. 79-1413.
 William W. Bedwell, Washington, D. C., for petitioner in No. 79-1442.
 Rhodell G. Fields and Joshua Z. Rokach, Attys., Federal Energy Regulatory Commission, Washington, D. C., with whom Howard E. Shapiro, Sol., Federal Energy Regulatory Commission, Washington, D. C., was on brief, for respondent.
 
 
 1
 Eugene W. Ward, Gen. Counsel, Tennessee Public Service Commission, Nashville, Tenn., was on brief for intervenor Tennessee Public Service Commission in Nos. 79-1413 and 79-1442.
 
 
 2
 Jack M. Irion, Shelbyville, Tenn., was on brief, for intervenor East Tennessee Group in No. 79-1413.
 
 
 3
 Before TAMM and MIKVA, Circuit Judges, and JOYCE HENS GREEN,* United States District Judge for the District of Columbia.
 
 
 4
 Opinion for the court filed by Circuit Judge TAMM.
 
 TAMM, Circuit Judge:
 
 5
 These two cases, consolidated for review, bring before us an order of the Federal Energy Regulatory Commission requiring two intermediate sellers of natural gas to pass through to their customers certain credits they received from their pipeline supplier when it failed to deliver all of its minimum contractual obligations in 1974 and 1975. The petitioners argue that the Commission could not lawfully order any form of pass-through and that, even if a pass-through is permissible, the Commission allocated it among the petitioners' customers according to an inappropriate formula. We affirm the Commission's decision in all respects.I. BACKGROUND
 
 
 6
 The petitioners, East Tennessee Natural Gas Company (East Tennessee) and Tennessee Natural Gas Lines, Inc. (Tennessee Natural), are natural gas companies subject to federal regulation under the Natural Gas Act, 15 U.S.C. §§ 717-717w (1976).[1] Both companies purchase gas from a single interstate pipeline company, Tennessee Gas Pipeline Company (the pipeline supplier), and resell it in Tennessee and Virginia to various jurisdictional customers i. e., resellers and nonjurisdictional customers i. e., end-users.[2]
 
 
 7
 The Natural Gas Act permits natural gas companies subject to the Commission's jurisdiction to charge only just and reasonable rates; unjust and unreasonable rates are unlawful. Id. § 4(a), 15 U.S.C. § 717c(a). Each natural gas company must file with the Federal Energy Regulatory Commission[3] schedules showing all its rates. Id. § 4(c), 15 U.S.C. § 717c(c). If the Commission determines that a rate is unjust or unreasonable, it may adjust the rate to a lawful level. Id. § 5(a), 15 U.S.C. § 717d(a).[4] A company's rate schedules, together with the forms it uses for its service agreements with customers, constitute its tariff, 18 C.F.R. § 154.14 (1979), and no company may charge its customers more than the rates that the Commission has permitted to take effect and that appear in the tariff, id. § 154.21.
 
 
 8
 Because the cost of purchasing its gas usually is the major element in a natural gas company's expenses, an increase in the price of gas historically has prompted a company to seek an increase in its rates. With fluctuations in gas prices becoming more common in the early 1970's, the Commission in 1972 amended its regulations to permit companies to include in their tariffs a "purchased gas cost adjustment" (PGA) provision. See Purchased Gas Cost Adjustment Provision, 47 F.P.C. 1049 (1972) (amending 18 C.F.R. § 154.38(d)). Under a PGA clause, a company may pass through to its customers increases in the cost of the gas it purchases without obtaining Commission approval for each change in charges. To protect the same customers, however, the Commission's 1972 order required all PGA clauses to provide that cost decreases also be passed through in the form of rate reductions. See id. at 1050-51. By using PGA clauses, companies can avoid the delay and expense of repeated filings with the Commission that simply "track" supplier price changes. This savings in time and money ultimately benefits natural gas consumers by reducing sellers' administrative expenses. See generally id. at 1050.
 
 
 9
 The cases before us now concern the tariffs in effect for East Tennessee and Tennessee Natural in 1974 and 1975. During this period, the service agreements between the pipeline supplier and each of the petitioners and between the petitioners and their jurisdictional customers assumed a form typical of contracts in the industry. The agreements required the seller (the pipeline supplier or one of the petitioners, as the case might be) to make available to the purchaser a specified minimum amount of gas each day. The purchaser also could buy more if it desired and if the seller could deliver it. Reflecting this arrangement, the pipeline supplier's and the petitioners' tariffs adopted a two-part rate structure. First, the purchaser would pay a fixed "demand charge" that would entitle it to demand the minimum amount per day. Second, the purchaser also would pay a "commodity charge," a set amount per thousand cubic feet of gas actually delivered. In theory, the demand charge recoups the fixed costs incurred by the seller in providing a transmission mechanism of sufficient capacity to meet the customer's peak-load minimum entitlement. These costs include pipeline construction, maintenance, depreciation, and taxes. The commodity charge, on the other hand, covers the seller's variable costs; for example, the gas itself and compression expenses.[5] The service agreements between the petitioners and their customers also included PGA provisions.
 
 
 10
 Due to the natural gas shortage that began in the early 1970's, the pipeline supplier started curtailing its deliveries late in 1973. During the period in question, the pipeline supplier was unable to meet its minimum delivery obligations under its service agreements with the petitioners, which in turn were prevented from meeting all the entitlements of their own customers. Due to this reduction, the pipeline supplier gave its customers, including both petitioners, "demand charge credits" reflecting its failure to supply their full entitlements.[6] To recover the funds lost by crediting demand charges, it added a surcharge to its commodity rate. In this manner, it would recover all its costs despite the reduction in revenues from demand charges. This system of demand charge credits recouped through commodity surcharges is designed to redistribute the economic burden of the curtailment more evenly among all customers that received some gas. Otherwise, this burden would fall most heavily on customers that were prevented from utilizing all of the pipeline capacity they had paid for through demand charges. See Joint Appendix (J.A.) at 103.
 
 
 11
 On November 14, 1975, and again on December 18, East Tennessee invoked the PGA provision in its tariff and filed an amendment raising its commodity charge to pass through to its customers the pipeline supplier's commodity surcharge. Tennessee Natural made a similar filing on December 1. Later in December, the Tennessee Public Service Commission (TPSC) requested permission to intervene in the Commission proceedings on each of the filings, arguing that the petitioners should pass through the demand charge credits as well as the commodity surcharges. Believing that the TPSC's argument raised substantial questions, the Commission ordered that the petitioners' filings be accepted, suspended for one day,[7] and put into effect "subject to refund" and that hearings be scheduled. Tennessee Natural Gas Lines, Inc., No. RP71-11 (PGA 76-1), at 3 (FPC Dec. 31, 1975), reprinted in J.A. at 93, 95; East Tennessee Natural Gas Co., Nos. RP71-15 & 75-28 (PGA 76-1) (DCA 76-1), at 2-3 (FPC Dec. 31, 1975), reprinted in J.A. at 126, 127-28. The Commission also granted the TPSC's petition to intervene.
 
 
 12
 After hearings, separate administrative law judges concluded that both petitioners were obliged to pass the credits through and that they should effect the pass-throughs by refunding the credits to their customers in the same proportion that the amount of gas curtailed to each customer bore to the total curtailment to all customers. On February 21, 1979, the Commission issued an opinion and order affirming the initial decisions insofar as they required the petitioners to pass through the demand charge credits. The Commission refused to follow the administrative law judges' allocation scheme, however, and instead adopted a formula recommended by its staff; namely, allocating the credits according to three-day peak sales, the method used to calculate the original demand charges. East Tennessee and Tennessee Natural have petitioned for review of this order.
 
 
 13
 Our role on review is a limited one. We must accept all the Commission's findings of fact if they are supported by substantial evidence, Natural Gas Act § 19(b), 15 U.S.C. § 717r(b) (1976), and we must uphold the order if it is just and reasonable in its consequences, Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968); American Public Gas Association v. FPC, 567 F.2d 1016, 1029-30 (D.C.Cir.1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). After undertaking this analysis, we conclude that the Commission's order in these cases must stand.
 
 II. THE LAWFULNESS OF THE REFUNDS
 
 14
 The petitioners challenge the Commission's decision to order the refunds on three common grounds. They argue, first, that the Commission already had approved an interpretation of their PGA provisions that does not require passing through the credits; second, that the Commission in its order construed the PGA clauses erroneously; and, third, that the Commission's action constitutes retroactive ratemaking. In addition, East Tennessee contends that the Commission erred by refusing to consider alleged equities in its favor. We reject each of these claims and conclude that the Commission's reasoning was proper and supported by substantial evidence.
 
 A. Prior Filings
 
 15
 The first two of petitioners' arguments arise because they and the Commission have placed different constructions on the relevant PGA provisions. We may dismiss quickly the first of these arguments. On three occasions prior to the filings now before us, the Commission had accepted other PGA filings from each of the petitioners that did not pass through demand charge credits. The petitioners contend that these acceptances bound the Commission to the petitioners' interpretation of their PGA clauses, an interpretation that allows a surcharge pass-through without simultaneously passing through the credits. We disagree. The Commission's rules clearly state that acceptance for filing does not constitute approval. 18 C.F.R. § 154.23 (1979). Moreover, each notice of acceptance also stated expressly that it should not be construed as an approval and that it would not prejudice the Commission in making findings and entering orders in future proceedings. See Brief for Petitioners apps. A & B. Thus, the prior filings in no way hindered the Commission from taking whatever action it would deem appropriate.B. The Meaning of the PGA Provisions
 
 
 16
 The petitioners read their PGA clauses as requiring adjustments in demand charges only when the pipeline supplier alters its basic rate schedule but not when it gives credits that do not change the rates.[8] The Commission, on the other hand, argues that its PGA regulations require that credits, as well as surcharges, be passed through to customers: "The jurisdictional portion of all refunds received from suppliers (including interest received) applicable to purchases after a PGA clause becomes effective shall be flowed through to the company's jurisdictional customers." 18 C.F.R. § 154.38(d)(4)(vii) (1979). At the time in question, the regulations also permitted a natural gas company to establish a new account in which it would "accumulate purchased gas cost reductions that cannot be incorporated into the existing tariff." Id. § 154.38(d)(4)(iv)(a ) (1976) (amended 1978). These regulations on their face require companies to pass through refunds as well as prepayment reductions and, when those refunds cannot be made immediately, permit the companies to place them in a deferred account. The Commission's order to pass through the demand charge credits given by the pipeline supplier is a direct application of these regulations. Far from being arbitrary or capricious, this conclusion is in full accordance with the law.
 
 
 17
 The petitioners argue that the Commission waived these regulations when it permitted them to put their PGA provisions into effect. They contend that the orders approving of the PGA clauses waived all inconsistent rules and that the Commission thereby approved the absence of the credit pass-through even though this procedure would violate the regulations. We do not agree. First, each PGA provision requires the pass-through of all changes in "rates" made pursuant to the pipeline supplier's own tariff. See note 8 supra. We concur with the Commission's decision that the concept of changes in "rates" embraces the issuance of credits against future billings. Second, we do not believe that the Commission, when it approved the petitioners' tariffs, also was indicating agreement with the restrictive interpretation that the petitioners now place on the PGA clauses. PGA provisions are designed to adjust a company's charges periodically to parallel changes in its own costs. The Commission, in adopting its PGA regulations, concluded that customers should receive the benefit of cost reductions as well as the burden of increases. See pp. 796-797 supra. Adjustments to reduce rates can take the form of lower current bills, subsequent refunds, or credits against future payments. Nothing in the policy that requires pass-throughs would restrict their form to changes in current bills. If the Commission had intended a departure from this policy so dramatic as the petitioners' restrictive interpretation of their PGA provisions, it surely would have accompanied its decision with a thorough explanation, an explanation absent here. We therefore conclude that the Commission approved the PGA clauses believing that they conformed to its regulations, which require all forms of cost-reducing pass-throughs.
 
 C. Retroactive Ratemaking
 
 18
 The petitioners also accuse the Commission of having violated the Natural Gas Act's ban on retroactive ratemaking. Long-standing precedent under the Natural Gas Act has construed the grant of power in section 5(a) to "determine the just and reasonable rate . . . to be thereafter observed and in force," 15 U.S.C. § 717d(a) (1976) (emphasis added), as being limited to the power to establish rates for the future, not to alter past rates. E. g., FPC v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S.Ct. 281, 295, 88 L.Ed. 333 (1944). This rule "bars utility refunds for past excessive rates, or the Commission's retroactive substitution of an unreasonably high or low rate with a just and reasonable rate." City of Piqua v. FERC, 610 F.2d 950, 954 (D.C.Cir.1979).
 
 
 19
 Despite the petitioners' contentions, the Commission's action simply was not retroactive ratemaking. The petitioners' tariffs on file during the period in question provided for passing through the demand charge credits. See p. 799 supra. Thus, all the Commission has done is to order the petitioners to abide by their tariffs already in force.[9] Because of the nature of the rate adjustment by the pipeline supplier it appeared as credits against future bills an appropriate method of implementing the pass-through would assign credits against bills to be sent in the future to the petitioners' own customers. The Commission had permitted the petitioners' PGA increases to take effect subject to a refund if the TPSC's objections had merit. A present refund on past payments under these circumstances is not a retroactive change in rates: it simply reflects how the passage of time can alter the appropriate form of the pass-through that was mandatory under tariffs already in effect when the payments were made. The rule against retroactive ratemaking only requires that natural gas companies, the Commission, and courts abide by an administrative determination (including any modifications on judicial review) that a particular rate is just and reasonable. It does not prohibit the Commission from ordering a company to honor its tariff when the tariff itself calls for an adjustment.[10]
 
 D. Equity and East Tennessee
 
 20
 East Tennessee, but not Tennessee Natural, also claims that equitable considerations militate against the Commission's ordering a pass-through in its case. Specifically, it contends that it did not earn an excessive return by retaining the demand charge credits and that it refrained from filing a general tariff increase because of the prior filings that the Commission accepted. We nonetheless decline to invoke our equitable powers.
 
 
 21
 We have a variety of problems with East Tennessee's position. First, although the Commission may take equitable factors into account in assessing whether a proposed rate is just and reasonable, it does not have general equitable powers to make adjustments in rates already in effect. See City of Chicago v. FPC, 385 F.2d 629, 642-43 (D.C.Cir.1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968). Second, any adjustments in East Tennessee's tariff at this date would be the very retroactive ratemaking that the petitioners so vociferously have decried. See p. 799 supra. Third, acceptance of the earlier filings did not constitute approval. See p. 798 supra. The Commission simply indicated that it was not taking any action at that time but that it was retaining the right to act in the future. Thus, when East Tennessee elected not to file a general rate increase, it did so at its own risk. Having received the Commission's approval for a particular rate scheme, it accepted the hazard of possible losses should that scheme prove inadequate. See FPC v. Tennessee Gas Transmission Co., 371 U.S. 145, 153, 83 S.Ct. 211, 215, 9 L.Ed.2d 199 (1962).
 
 III. METHOD OF CALCULATION
 
 22
 Having determined that the petitioners must pass the credits through to their customers, we now must consider the petitioners' disagreement with the method the Commission devised for calculating the amount each customer should receive. The Commission ordered that the refunds be allocated on the basis of three-day peak sales, the method used to calculate the demand charges themselves. The petitioners believe that this formula is inequitable and contend that the credits should be distributed instead in proportion to the actual volume reductions each customer experienced.
 
 
 23
 In essence, the petitioners argue that because a curtailment caused the credits, the credits should be distributed based on volume curtailed. Their approach would spread the credits among all their customers, but it would benefit primarily the nonjurisdictional customers, which were being served on an "interruptible" basis i. e., their supplies could be and were cut off so that higher priority customers entitled to minimum deliveries could receive as much gas as was possible.[11] In the petitioners' eyes, these nonjurisdictional customers suffered more from the curtailment because deliveries to them dropped more proportionally than did deliveries to jurisdictional customers, with their minimal entitlements. The Commission's method, on the other hand, would pass through most of the credits to jurisdictional customers, high-priority purchasers that experienced proportionally smaller reductions. This alleged inequity is compounded, the petitioners submit, when one recognizes that the pipeline supplier's commodity surcharges to recoup the credits will be passed through according to volumes to be delivered.
 
 
 24
 No one disputes that the Commission's distribution formula gives more of the credits to jurisdictional customers. Once again, however, we must side with the Commission in its conclusion that this outcome is appropriate. The curtailment affected the petitioners' customers in two different ways. All customers suffered volume reductions in varying amounts. In addition, some customers had paid demand charges for minimum entitlements, which represent a payment for pipeline capacity that could deliver those entitlements. These customers did not receive the full entitlements; thus, they paid for capacity that was never used. In a sense, all customers have been "compensated" for undelivered gas, for they did not pay commodity charges for gas they did not receive. Nevertheless, some customers in effect have paid for unused capacity in the transmission system but have not yet been reimbursed for its nonuse. Allocating these credits according to the method by which demand charges are assessed ensures that the customers that "overpaid" demand charges receive some compensation.
 
 
 25
 Substantial evidence in the record supports the Commission's finding that the payments giving rise to the credits to be passed through occurred in the demand (fixed-cost) component of the petitioners' two-part rate structure, not in the commodity (variable-cost) portion. The whole system of demand charge credits recovered through commodity surcharges is designed to distribute more evenly among all customers the costs of paid-for but unused capacity caused by a curtailment, rather than allowing them to fall solely on customers that paid the demand charges. See p. 797 supra. We are satisfied that the Commission's method of allocating the refunds is a logical and reasonable approach to the situation that confronted it. We cannot demand more.
 
 IV. CONCLUSION
 
 26
 The Commission has concluded correctly that the petitioners must pass through the benefits as well as the burdens that they experience under the PGA provisions of their tariffs. Similarly, they must effect the pass-throughs by a method that reflects the origin of the credits. The Commission's conclusions are amply supported by the record and, therefore, its order is
 
 
 27
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 A natural gas company is an individual or a corporation "engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." Natural Gas Act § 2(6), 15 U.S.C. § 717a(6) (1976). The provisions of the Natural Gas Act apply to the transportation of natural gas in interstate commerce and to its sale for resale to others but do not apply to sales to ultimate domestic or commercial end-users. Id. § 1(b), 15 U.S.C. § 717(b) (1976)
 
 
 [2]
 The Natural Gas Act governs only sales for resale and not sales to end-users. See note 1 supra. Accordingly, a jurisdictional customer is one that purchases gas for resale and a nonjurisdictional customer is one that purchases gas for its own use. East Tennessee has numerous customers of both kinds. Tennessee Natural has three nonjurisdictional customers, all commercial, but sells primarily to a single jurisdictional customer; namely, Nashville Gas Company, a wholly owned subsidiary of Tennessee Natural that resells to end-users in Nashville
 
 
 [3]
 These proceedings began before the Federal Power Commission (FPC). In 1977, Congress abolished the FPC and transferred responsibility for regulation under the Natural Gas Act to the newly created Federal Energy Regulatory Commission (FERC). See Department of Energy Organization Act § 402(a)(1)(C)-(F), (a)(2)(B), 42 U.S.C. § 7172(a)(1)(C)-(F), (a)(2)(B) (Supp. II 1978). In this opinion, "Commission" means the FPC for events occurring before the changeover and the FERC for events occurring thereafter
 
 
 [4]
 The Commission may not alter rates retroactively, however. See pp. 799-800 infra
 
 
 [5]
 See, e. g., Consolidated Gas Supply Corp. v. FPC, 520 F.2d 1176, 1179-80 (D.C.Cir.1975); Lorne, Natural Gas Pipelines, Peak Load Pricing and the Federal Power Commission, 1972 Duke L.J. 85, 86-95; Pierce, Natural Gas Rate Design: A Neglected Issue, 31 Vand.L.Rev. 1089, 1094-97 (1978). For a general description of two-part rate systems, see 1 A. Kahn, The Economics of Regulation: Principles and Institutions 95-100 (1970)
 
 
 [6]
 The petitioners argue that in reality these are "curtailment credits" that reflect volume reductions. They contend that by focusing on the pipeline supplier's application of the credits against demand charges the Commission has become lost in labels. The Commission's determination that the credits are "demand charge credits," however, draws ample support from the evidence in the record. When all the labels are cast aside, it becomes clear that the credits arose because of a failure to meet minimum delivery obligations, that the demand charges paid by the petitioners were based on those minimum entitlements, and that the pipeline supplier allocated the credits on the basis of the gap between entitlements and actual deliveries. See generally Joint Appendix (J.A.) at 40-41 (testimony of Serafin Guevara); id. at 78-82 (testimony of Robert E. Scarbrough)
 
 
 [7]
 The Commission may suspend proposed rate changes for up to five months while determining whether they should take effect. When the suspension ends, however, the rates must go into effect, although the Commission may order that they be subject to refund. Natural Gas Act § 4(e), 15 U.S.C. § 717c(e) (1976)
 
 
 [8]
 East Tennessee's PGA provision at the time in question read:
 The rates in Seller's (East Tennessee's) Rate Schedules as contained in Volume No. 1 of Seller's FPC Gas Tariff shall be adjusted from time to time to currently reflect changes in rates charged to Seller by Tennessee Gas Pipeline Company, a Division of Tenneco Inc. (Supplier) in accordance with the procedure herein specified.
 Brief for Petitioners at 14 n.13. Tennessee Natural's PGA clause read:
 When Supplier changes the G-1 rates pursuant to the operation of its (Supplier's) FPC Gas Tariff, Seller (Tennessee Natural) shall adjust the Demand Charge and the Commodity Charge of this Rate Schedule downward and may adjust such charges upward by the following procedure.
 Id.
 
 
 [9]
 The petitioners contend that this court's recent decision in Public Serv. Co. v. FERC, 600 F.2d 944 (D.C.Cir.), cert. denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979), compels us to conclude that the Commission's action constitutes retroactive ratemaking. We fail to see, however, how that case applies to the situation before us now. Public Service Co. involved electric utilities' change from one fuel adjustment clause to another. The present situation involves construing the application of a single PGA clause. The allegedly retroactive changes here are not retroactive at all; they simply implement an existing rate system that requires periodic adjustments
 
 
 [10]
 The petitioners also contend that the Commission's action violates the "filed rate doctrine" under the Natural Gas Act. This principle states that a utility "can claim no rate as a legal right that is other than the filed rate . . . ." Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951). We do not believe that the filed rate doctrine applies to the situation before us. That rule only precludes parties from attacking in separate judicial proceedings a Commission-set rate, which may be challenged only through judicial review. Maine Pub. Serv. Co. v. FPC, 579 F.2d 659, 666 (1st Cir. 1978). As this court has stated:
 The considerations underlying the doctrine, however, are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant. We perceive no reason why the doctrine should be employed to render unmodifiable a rate which has been filed in breach either of authority or contract. Surely the agency loses no control over the rate-setting process by allowing a party to show that the rate on file is a mistake.
 City of Cleveland v. FPC, 525 F.2d 845, 854 (D.C.Cir.1976) (footnote omitted). Allowing a party to demonstrate that a natural gas company has misapplied the terms of its tariff does not violate the filed rate doctrine.
 
 
 [11]
 See Lorne, supra note 5, at 92-93